All right, we're ready to hear argument in our next case, United States v. Sanders. Ms. Skelton. Good morning. May it please the Court, my name is Megan Skelton, arguing for the appellant Cory Sanders. In this case, the jury instructions allowed the jury to convict on a standard that was lower than willfulness. And taken as a whole, they were confusing and a misstatement of the law. In addition, the district court improperly interpreted the phrase sophisticated means, which, as we explained in the supplemental briefing, is a genuinely ambiguous term. And so as a result, the district court improperly increased Mr. Sanders' offense level by two levels. And now on the jury instruction issue as being a confusing misstatement of the law, what is the standard of review? The standard of review is de novo because our argument is not whether evidence supported the jury instruction, which is something that the government argued in its brief. Wait, but what was the objection below? Where can I find below where the objection was that it was a misstatement of the law? Your Honor, I believe that it was a general objection to including the instruction at all. I think so. I think it was an objection that it wasn't supported by the evidence. Your Honor. Which would make it plain error review. Even under plain error, this would still be a reversible error.  And that's because it is clearly plain. No court has ever approved this instruction before. And it is a clear misstatement of the law. Willfulness is a well-defined term. Has any court, you said no court has ever approved this instruction before. Has any court ever disapproved this and disapproved? Not this particular instruction. This seems to be a very unpopular instruction. However, courts have specifically disapproved of the use of the word irregular with respect to the term willfulness. And that is really what our concern is here is that that term irregular allows a jury to convict based on carelessness, negligence, scatterbrainedness. Counsel, isn't the same true of secretive? And you're not challenging that. But people can act in secretive ways that are not at all willful. It's not that they know it's illegal. They don't want to violate a company policy. They don't want to get caught by their spouse. So I guess I'm not understanding how you can make this argument as to, I can't even remember, the thing that is not secretive.  Irregular, thank you. What's the difference? Well, there's a couple of differences. And irregular is worse than secretive. The other way to put that, I think, would be that maybe the inference of willfulness is stronger from secretive than from irregular. But that's like a difference of degree. And it's a jury question. Well, it is a jury question. I have a couple of responses to your question, Judge Thacker. That's Judge Harris. Oh, I'm sorry. That happens all the time. I'm sorry. There are a couple of answers. It is a question of degree. But we've got a single instruction that puts these two as equal. And that's going to be confusing when you consider the jury. The fact that isn't the word or between the two words in the instruction? That is correct. Or is between them. But it's also kind of clumped together. The other part of my answer is that secretive is less concerning than irregular. But instructions that this Court has looked at that or, excuse me, not instructions, cases where this Court has looked at the word secretive with respect to willfulness tend to look at sufficiency of the evidence as opposed to the actual instruction. The instruction doesn't talk about secretive, but they look at the evidence of secretiveness. But those are also most specifically in sort of structuring or tax fraud, where the secretive conduct is very specifically tied to a specific known legal duty, not simply to the fraudulent intent. So the secretive conduct is linked up with something that would very specifically demonstrate a knowledge that you're acting contrary to the law instead of simply trying to do basic deceptions. I was talking about the fact that irregular is itself confusing. We don't know what regular is. And the real concern here is that this instruction would allow a jury to convict on something that we know is not willfulness, which is negligence. But wasn't the jury told specifically, this is what willfulness means and you can't convict if it's just negligence? Yes. It was instructed on that. And then it was immediately instructed on this. Not immediately. I thought in between. Am I not remembering right? First there's willfulness. Then there's that long paragraph about how, like, state of mind is not usually something that can be proven directly. Usually it has to be inferred circumstantially from conduct. And then at the end of that long paragraph you get this instruction that gives some examples of the kind of conduct that the jury could find is sufficient to infer the willfulness that they've already been instructed on. So I think when you look at it as a whole, it actually seems pretty consistent to me. I disagree. I think that when you look at these instructions as a whole, you've got conflicting instructions that would turn out to be confusing. So, yes, I 100% agree that the jury did have an instruction that said negligence is insufficient. But then we have the discussion of willfulness, we have this description, and then when we're talking specifically about fraud, there's another instruction that says misrepresentations alone are not fraudulent intent. You combine all of this stuff and it's a little bit like a roller coaster where the jury doesn't know which way it's supposed to go. We have misrepresentations, which are surely irregular, are not sufficient. Carelessness is not sufficient. But irregular is. So this leads to the jury. The instructions don't say irregular is sufficient. They say a jury could, may, infer from irregular conduct the mens rea. That's already been described to them. So, again, I'm not sure. I agree with you that if the instruction said if the defendant behaves irregularly, you should find willfulness, then we'd have a big problem. But that's not what they say. Looking at the instructions as a whole, secretive and irregular are the only specific examples of what would constitute willful behavior. Or what could constitute willful behavior. And so the fact that those are highlighted really amplifies them, where there's no other examples given. So, again, looking at it as a whole, it's really a problem, particularly since this is a really troublesome instruction. I discussed the provenance of this instruction in the brief. And the case that supposedly gives rise to it doesn't include the instruction, doesn't include any discussion of irregularity. Is that the case from 1919? It is, Your Honor. And it's never been cited. I tried both Lexis and Westlaw, and I could be wrong. Trying to prove a negative is certainly difficult. But I certainly didn't find that. This court has, of course, explored what willfulness means over and over and over again. I relied heavily on my brief in Blankenship, which I think is a really extensive discussion of it. And I think it supports this conclusion that multiple things could give rise to the inference of willfulness, but certainly not irregularity. And that case was focused on whether reckless disregard of a legal obligation would be an appropriate definition of willfulness. So it's not 100% talking about this, but that's part of the problem here, is that there really is no case that looks at an instruction like this. Can I ask you, so even if we, let's just for a moment assume that we would agree with you that there was error in what was provided. The next step, though, I just want to be clear on what your argument is, because you cite Sullivan v. Louisiana, but I don't think you're arguing that this is a structural error. Can you clarify that? Your Honor, I pointed to Sullivan simply to say that in some cases jury instructions that relate to elements can be. I'm not going as far as that, and I don't think that this court needs to. But it actually would dovetail with a point on whether it's plain error or not. It certainly does impact Mr. Sanders' substantial rights, because it diluted the government's burden on an element of defense, the intent element, which is, of course, the most contested element. The conduct here, a lot of the facts were not particularly contested. So it certainly does impact substantial rights. The Sixth Amendment jury trial right is about as substantial as it gets. Can I ask a question about that? And it goes back to the secretive versus irregular thing. I mean, even if we were to assume that the jury relied on this and drew an inference, I mean, all of the conduct in question could as easily be described as secretive, you know, the using of the fake names or email addresses. How do we know that the jury focused on irregular and not on secretive? Well, that's a real problem. We don't know what the jury. Right. But if we're under plain error, the burden is on the defendant to show that there was this effect on substantial rights. These are co-equal aspects of this instruction. And, again, as I said, they're the only sort of characterized activities that would allow the jury to draw this inference. So they are given a great deal of weight for the jury. Your Honors, I would like to move on to the sophisticated means argument. But I have actually one small thing to mention with respect to my reply brief. On page 4, there is a typo. I hope it's obvious that it was a typo. It is the forever cringe moment when you prepare for oral argument. I referred to this instruction talking about unconventional or what did I say? The word is uncontroversial. It certainly should be controversial. But moving on, and I'm sure there are typos in this argument, too. I hope that nobody finds them. Both parties agree that the term sophisticated means is genuinely ambiguous. And I will assume that I don't need to discuss that anymore unless you all ask me to. But using that assumption, what that means is that this Court has to defer to the commentary of the guidelines. And the commentary is very clear that it's not just sophisticated. Whatever that means, the commentary says it has to be especially intricate, especially complex, and, again, does give some specific examples, the shell corporations, the offshore accounts, really next-level kinds of sophistication. And this Court has not yet addressed that enhancement since KISOR, as far as I can tell. Again, the Court has certainly looked at sophisticated means over and over again, but not in sort of the new landscape of looking at regulations since KISOR and certainly since Loeber-Bright. So some of those cases that talk about sophisticated means might not have the weight. I don't understand that. If your position is that the guideline is ambiguous, that means we do defer to the commentary. So why wouldn't pre-KISOR cases, which also defer to the commentary, be precedent? Some of them do and some of them don't. We have pre-KISOR cases saying we refuse to defer to the commentary? No, but some of them don't address the commentary at all.  I've never found a case that this Court abandoned the commentary. Okay. I don't believe that happened. But what that does mean is that sort of looking at the timing of the cases, and some of them are before the most recent amendment to the commentary, so some of those cases need to be looked at a little bit more carefully. Like GenWright, for example, was 2014. That was before the current version of the commentary, although in that case it does examine the commentary. Assuming that the application of sophisticated means enhancement was error here, why isn't it harmless error given that the district court very clearly said it would have given the same sentence regardless? For multiple reasons. First of all, the judge said that he would have given the same sentence, but it wasn't really for multiple reasons. It was really for loss. At the beginning of the sentencing hearing, he discusses loss at length, and then during the discussion of his analysis of the 3553 factors, he reverts to loss again multiple times. Counsel, I agree with you that the district court sort of had in mind, like the big argument at sentencing was about the loss calculation, but I'm not sure it matters. I think our case law suggests that if a district court says, as this one did, like I think something like, I want to be as clear as is humanly possible. In the most emphatic terms that I can muster is what the district court said. I don't care what the guideline range is. This sentence I got to only under 3553A. And he actually specifically says at one point, even if the offense level were, and I can't remember the number, but it's something way under two levels down from the one the court was using, I would still come out the same way. And I'm just, I don't know how we get around that under our case law. Well, I think that we have to really look at what he, like, we don't have to guess what he was thinking about when he says in the most emphatic terms. The government was looking for loss figures that were way higher than what the court ultimately decided. The defense was asking for loss figures that were way lower. This was argument. There was evidence. There was discussion. When he was going through the 3553 factors saying this factor is how I'm thinking about the case, this factor is how I'm thinking about it, looking at the nature and circumstances of the offense and the seriousness of the offense in particular, which is where you would expect to see a discussion of loss. And also the guidelines, of course, is like the eighth factor. The judge went through all of the discussion of loss as a poor proxy and never referred to either the conduct that was theoretically sophisticated or the sophisticated means of enhancement. The guidelines range would have been 37 to 46 months, which is lower. And the sentence was 45 months, so just one month shy of the top range. And he went one month lower than the bottom of the other range. I think when you look at these and see what he's really thinking about, it's clear this was not something that he was considering when he was talking about how I would give the same sentence. I see my time is two seconds from up. All right, thank you. You have three minutes in rebuttal. All right, we'll hear from Ms. Cussin. Good morning, Your Honor. May it please the Court. Evelyn Lombardo Cussin on behalf of the United States. With respect to the two issues in this case, if I can begin with the jury instruction issue, as my colleague did. The Court referenced this in its questioning. This was really a permissive instruction. The Court went to great lengths in terms of the instructions to explain what inferences are and how willfulness is often not able to be discerned from direct evidence. We're often in the situation where we don't have direct evidence of willfulness. And so the Court described this and described how the jury could make inferences and said very clearly that it was the province of the jury to determine whether the conduct that the government argued about was evidence of willfulness or not. And so you can find that in the record at pages 1434 and 1435. Judge Bredar says the government asks you to draw one set of inferences while the defense asks you to draw another. It's for you and you alone to draw what inferences that you will draw. But with this instruction, the jury could have drawn an inference that negligence was enough and negligence is not enough. No, Your Honor. I don't think that the jury could have drawn an inference that negligence was sufficient, particularly given the specific instruction to the jury that negligence was not enough. And you're talking about if you look at the big picture, all of the injury instructions, rather than focusing on just this one that came out of nowhere. Where did this come from? Has any court ever approved this particular jury instruction? Your Honor, this instruction is a word-for-word instruction from SAND. I can tell you that it is an instruction that we use in the District of Maryland with some regularity. So in answer to the question about whether any court has ever approved this instruction, I guess district courts in Maryland have. It just hasn't had occasion to be appealed yet? Yes, I don't think it's been litigated. I think that courts do use this instruction, but it hasn't been challenged. And as the court noted, the issue with the instruction was really the factual predicate for it, you know, whether there was this evidence of secrecy. Which is why this is plain error review versus de novo. Yes, Your Honor, though I think under either standard, the government should win in this case. But you argued in your brief that the standard is de novo. Yes, I did, Your Honor. And is that because is the government's position that there was, that this objection was raised in the district court, that this was a confusing and incomplete instruction? Or is the government's position that it doesn't really matter if you object on one ground, that's good enough to preserve all objections? I think I was trying to view it in the light, you know, sort of give some consideration to the defense perspective here. There was an objection, but really that objection was to the factual basis and not to the wording of this instruction. And isn't our law pretty clear that you have to object on the ground you want to raise on appeal? Yes, Your Honor. And if we look, the court's questioning was getting to this, I think. If we look at these instructions as a whole, they comprise five pages of the joint appendix. And this particular instruction is one sentence. It's a permissive instruction. And it really gives some information to the jury about the types of things that they can look at. They're not required to look at. But the types of things they can look at to determine whether someone is acting with the requisite intent. And Judge Berdar says this in the instruction on page 1444. Medical science has not yet devised an instrument capable of recording what was in one's mind in the distant past. And so we have to infer this from the particular circumstances of the case. And there were many examples of this defendant's secretive and irregular behavior from which the jury could infer that this was not a mistake, that he was acting with the requisite intent. And an important fact in this case, which was evidence adduced at trial, was that this defendant began his career prior to forming these businesses. He worked for a government contracting business, ProTelecom, and he was instructed as an employee at ProTelecom about the significance of the representations that one makes to the government and the requirement, the absolute requirement, that in a government contract the contractor provide conforming equipment. And that was the conversation with the Mr. Sanders boss that was recorded and played at trial. And so that's further evidence of intent. You were just talking about, you know, that the defendant acted secretively. You know, I think their original objection, which is that the evidence really just doesn't fit the instruction, probably is the best objection because it's not really about the defendant being secretive. This instruction is geared towards secretive transactions, I mean, which is to me somewhat different than, I mean, really the context is probably best used in a banking context where the nature of the question about how the transaction was undertaken, that that would speak to intent. Whereas here, while some of his conduct may have been secretive, the transactions themselves weren't in any way secretive. They were done out in the open. I mean, I think the combination of all these tends to be confusing. And it is an instruction I wouldn't give because I think it would confuse the jury. When you look at the harmless error arguments that you make, a lot of, in that context, those cases deal with instructions that weren't given. But in this context, you have a case in which the instruction was given. And so I guess my question is, how do you make your argument regarding what effect this jury instruction had on the jury, given that it's an instruction that was given versus not given? Well, with respect to the earlier point that there were not secretive transactions, if I could push back a little bit, there were transactions that were secretive. This defendant needed to be a partner of Cisco in order to supply equipment to the government, to various government agencies. And he was removed from the Cisco partner program because he had made false representations to the government and Cisco found out about it. And so what the defendant did, and we went to some effort to include in the record particular exhibits that were adduced or that were admitted at trial relating to this, the defendant repeatedly endeavored to register with Cisco. And in doing that, he used different names, different addresses, different usernames. And in each of those registration attempts, he was registered for a period of time with Cisco before that company was able to discern that he was Corey Sanders and should be removed from the program. So I would say that those are examples of secretive or irregular transactions. Each of those registration attempts. With respect to the question of harmless error as a whole, I think the court can very readily look to the instructions given in this record and the lengths with which the court went to describe what inferences are and how the jury may or may not draw inferences and how the court correctly instructed the jury about willfulness. And this, again, was a permissive instruction. The jury wasn't required to do anything with this information. And there, of course, are other examples. There are other factual examples which support giving the instruction. The fact that Mr. Sanders dissolved Santec and formed PSYCOR to avoid his negative performance history with the government. The evidence about the contract novation and the change of names. The multiple registration attempts, which I've described. And then, of course, the fabricated documents for the Polycom and Cisco registrations. Mr. Sanders submitted a false document claiming that he was a partner of Polycom and could provide Polycom equipment to the government and also a false partner certificate with Cisco. Did any of the attorneys reference this jury instruction in their closing arguments? I gave the closing argument for the government, and I don't believe that I referenced this instruction. And my recollection is that the defense did not either. And, in fact, the jury was instructed first, and then we went into the closing arguments. And Judge Bredar counseled us not to specifically walk through the elements that it was his job to go through and instruct the jury. And so I certainly endeavor to stay away from that. That's, again, my recollection of the trial, Your Honor. Now, with respect to sophisticated means, the parties do appear to be in agreement that sophisticated means is a term of art, that it's susceptible to more than one meaning, and therefore a resort to the commentary is appropriate and helpful. And as the court, in terms of its questioning of my colleague, the court noted, how is the application of this enhancement, even if it was improper, which the government certainly doesn't concede, how is it not harmless? And so I think, again, resort to the record here shows that Judge Bredar was very focused on the 3553A factors. And there was a great deal of discussion about loss and how loss drives the guidelines. And Judge Bredar said at one point in the sentencing presentation that he felt grateful that the guidelines were not mandatory because he felt that he needed latitude in terms of this case. And so he spends a great deal of time going through the 3553A factors, and that is on Joint Appendix pages 1720 to 1730. And at one point, the judge is talking about this particular crime and what it is that Mr. Sanders did, and he says at page 1723, if everyone operated like Mr. Sanders, where the only principle was how can I profit from the system as opposed to how do I comply with the rules of the system and operate in an honest way, if everyone operated in the way that Mr. Sanders was shown to operate in this case, the economy would fall apart. We don't have the means. We don't have enough. There's a bunch of agents in this courtroom, but there aren't enough on the planet to deal with these circumstances. And he goes on. And so he goes through each of these factors in 3553A. He looks to the sentencing guidelines as is required under those factors, and then he says, as the court indicated, he announces his sentence, and then he says in the most emphatic terms that I can muster, this is the sentence that I would impose. And I think, Your Honor, I think Judge Berdar was trying very hard to mirror the language in Gomez-Gimenez where the court said at page 382, in this case the district court made it abundantly clear that it would have imposed the same sentence regardless of the advice of the guidelines. In pronouncing the sentence, the court stated, I've considered all of the 3553A factors, and in imposing this sentence, I do believe that I've properly calculated the advisory guideline range. If for some reason someone were to determine that I did not, I announce an alternative variant sentence. Now, Judge Berdar did not cite these cases, but he said. So all of that goes to harmlessness. Yes. Well, can we get to why wasn't this error in the first place to impose the sophisticated means enhancement? Because the scheme here was absolutely sophisticated, and the court's cases make clear that all you need is sophistication beyond the basic elements of the crime. And we have that. You know, in terms of the submission of. . . And how does the commentary help you? Opposing counsel looks at the commentary and says, those examples there are next level kinds of sophistication that we don't have, she argues, in this case. I think the commentary is helpful. The commentary talks about fictitious entities, and we have that here. When Mr. Sanders fabricates a document saying that PSYCOR is Polycom certified and able to sell to the government, he is representing a fictitious entity. But isn't that just the fraud? I mean, it just seems to me that if he was going to carry out this fraud, this is how he was going to have to do it, represent that he's an agent of these companies when he's not. He might have to represent it, Your Honor, in many instances. And so we had contracts and agency representatives from all over the government, and some were more exacting than others. So some, he would submit a bid and say, I'm going to provide this new Polycom equipment. And they would say, okay. It has to be new and under warranty. Others who perhaps were more concerned about certain issues, if maybe it is a military contractor, maybe they've had different training, they're asking for a document showing the certification. So to defraud them, he needed a document. To defraud them, in order to get the bid, he needed a document. I'm still not understanding how that isn't just what he had to do to commit the fraud, right? Sometimes to commit the fraud, he needed a document. Sometimes he didn't, but it's just what he needed. Oh, are you saying that he submitted the document even when no one asked for it? No, no. I'm saying that. Then how is he doing more than what is just the intrinsic in the fraud itself? Anytime he submitted an invoice for payment to the government and said, I've provided these conforming goods that were according to the FedBid terms, that could accomplish a wire fraud, right? The submission is using the transmission of sight, sounds, et cetera. It's a false claim and a false representation. He did more than that by fabricating these documents. You're saying that so long as it goes beyond the elements of the crime, like had he committed a different kind of fraud, he wouldn't have had to do this document. He could have still committed fraud without the document. But to commit this fraud, he needed the document. Well, if we look at, I mean, there were a number of- I see what you're saying, but that seems like a weird way to think about it. There were a number of different wire fraud counts, and not everyone was associated with a false Polycom or a false Cisco certification. In some, you know, there was a representation that he was associated with Cisco, and that was enough. But what I'm trying to articulate is that he could commit this particular government contracting type fraud without these fictitious entities making the-providing the false documentation from Polycom with the signature of Barbara Huelskamp from Polycom or providing the gold Cisco certificate. He could still have gotten those contracts and provided nonconforming goods and known that he was doing that. Theoretically, he could have done that. Yes, and in some instances he did. In some instances he absolutely did because people didn't know to ask. So I would have thought that the comment-I would have been looking at, like, well, did he hide the proceeds? Did he-like, everything you're talking about is just sort of the same stuff he did to commit the fraud. Doesn't there have to be something extra? Well, if we look at the court's-if we look at the court's case law on this, for example, in United States v. Ginwright, the court said, the court need only find the presence of efforts at concealment that go beyond, not necessarily far beyond, the concealment inherent in fraud. And so all-the wire fraud, the submission of the false claim for payment, the submission of a false document, those could be accomplished without the level of sophistication that Mr. Sanders applied here. And so we also have, you know, in addition to these forged or falsified documents, we have other examples here. We have the termination of one business and the formation of a new one to avoid this negative performance history in the government contracting database, FAPES. We also have the fact that Mr. Sanders used different addresses throughout the United States to make it appear as though his geographical footprint was bigger. Your Honor, I see that my time has expired. May I finish my response? Yes, please. And then, of course, we also have variations of the names in the Cisco program, as I mentioned, and the formation of yet another company, a third company, Armonis. If the court has no further questions, we respectfully ask that the court affirm. All right. Thank you. Ms. Skelton. Thank you, Your Honors. To the question of whether other courts have approved this, if this case or this instruction is being used regularly in the District of Maryland and not being challenged, I believe that should give the court some concern. I'm more an appellate lawyer than a trial lawyer. I don't really know what's happening in the trial world, but when an instruction that is a misstatement of the law is given regularly, that seems like it is appropriate for this court to step in and provide its guidance of what should and should not be the definition of an intent. And, Judge Haynes, to address your points with respect to the government's argument regarding harmless error, when they are looking at the absence of an instruction, it is a very different situation than here where an instruction affirmatively misstated the law on an element of the offense, which is a far more serious issue. Talking briefly about the sophisticated means enhancement, first of all, one thing that I think I really need to say is that a false document in and of itself is not sophisticated. And that is, as you mentioned, Judge Harris, potentially just part of how a misrepresentation is made. Another thing to look at is the particular false documents in question, which were extremely rudimentary and did not even necessarily say what the agencies were looking for, might have in some instances had the wrong level of partnership gold instead of silver. I'm not quite sure. I don't remember exactly the words. But they were false, but not even false enough to have succeeded. This is something that is a second-grade project on Adobe right now. This is not a sophisticated thing. I also take issue with the fact that PSYCOR was a shell corporation. It absolutely was not. It was doing business. A shell corporation would be simply for the purpose of hiding transactions and not conducting business. Now, there was also nothing hidden or certainly wasn't offshore, certainly wasn't shell. But Mr. Sanders' use of PSYCOR was as open to the government as it could be. When he was trying to get a contract transferred from Santec to PSYCOR, he couldn't get the paperwork right, and the agency helped him. They went to their lawyers to help say, how does he need to fill out this form? Then they funneled that information to him. He was not hiding anything. Counsel, can I ask you a question? I'm sort of genuinely perplexed. You know, we've said a number of times that for the enhancement to apply, there has to be something more than, not a lot more, but something more than what is intrinsic in fraud itself. And I understand your colleague to be saying we almost do like a categorical method thing, just look at the elements of fraud. And if we can imagine someone's conduct satisfying those elements, but without, say, fake documents or a second company, then we're good. Do we look at whether it is possible to accomplish a fraud without these methods, or do we look at whether it was possible to accomplish this fraud without these methods? May I answer, Your Honor? That is why I asked. I think it is neither, to be honest. And this is in deferring to the commentary, which very explicitly says we have to look at the defendant's conduct to determine whether the conduct merited sophisticated means. So that means that the offense and the elements and even the factual scenario, that that is not the question. The commentary is very specific that it is what the defendant did. So it's not, in a hypothetical world, how could this fraud have been committed, because there's infinite, theoretically, you know, number of ways. And we know, deferring to the commentary, that that is not the analysis. The analysis has to be what the defendant did in this specific case. And so what that means is, looking at that, we need to look at this relational issue. Is it especially complex? Is it especially intricate? Not, did you have to do this necessarily? Because that's where, for example, Adepoju goes where a false document in and of itself is not necessarily fraudulent. Did that answer your question? All right. Thank you. And thank you, Ms. Skelton, for accepting this court-appointed appeal. We appreciate your service on behalf of the court. Thank you. You're very welcome. And thank you, Ms. Cousin, for your able representation of the government.
judges: Stephanie D. Thacker, Pamela A. Harris, Elizabeth W. Hanes